IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:13-CV-874-D

| | | |
|---|---|---|
| RONALD ROGERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM AND** |
| v. | ) | **RECOMMENDATION** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

In this action, plaintiff Ronald Rogers ("plaintiff" or, in context, "claimant") challenges the final decision of defendant Acting Commissioner of Social Security Carolyn W. Colvin ("Commissioner") denying his applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") on the grounds that he is not disabled.[1] The case is before the court on the respective parties' motions for judgment on the pleadings. (D.E. 29, 31). The motions were referred to the undersigned Magistrate Judge for a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* D.E. 33). The motions have been fully briefed.[2] For the reasons set forth below, it will be recommended that the Commissioner's motion be allowed, plaintiff's motion be denied, and the final decision of the Commissioner be affirmed.

---

[1] The statutes and regulations applicable to disability determinations for DIB and SSI are in most respects the same. The provisions relating to DIB are found in 42 U.S.C. subch. II, §§ 401, *et seq.* and 20 C.F.R. pt. 404, and those relating to SSI in 42 U.S.C. subch. XVI, §§ 1381, *et seq.* and 20 C.F.R. pt. 416.

[2] Each party filed a memorandum in support of its motion (D.E. 30, 32).

# I. BACKGROUND

## A. Case History

Plaintiff filed applications for DIB and SSI on 8 November 2010 and 3 November 2010, respectively, alleging a disability onset date of 15 October 2010. Transcript of Proceedings ("Tr.") 13. The applications were denied initially and upon reconsideration, and a request for hearing was timely filed. Tr. 13. On 21 June 2012, a hearing was held before an Administrative Law Judge ("ALJ"), at which plaintiff and a vocational expert testified. Tr. 31-63. After the submission of additional evidence (Tr. 684-97), the ALJ issued a decision denying plaintiff's claim on 13 August 2013. Tr. 13-24. Plaintiff timely requested review by the Appeals Council. Tr. 7-9. On 29 October 2013, the Appeals Council denied the request for review. Tr. 1-6. At that time, the decision of the ALJ became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481. Plaintiff commenced this proceeding for judicial review on 5 February 2014, pursuant to 42 U.S.C. §§ 405(g) (DIB) and 1383(c)(3) (SSI). (*See In Forma Pauperis* Mot. (D.E. 1); Order Allowing Mot. (D.E. 5), Compl. (D.E. 6)).

## B. Standards for Disability

The Social Security Act ("Act") defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 42 U.S.C. § 1382c(a)(3)(A); *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *see* 42 U.S.C. § 1382c(a)(3)(B). The Act defines a physical or mental impairment as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The disability regulations under the Act ("Regulations") provide a five-step analysis that the ALJ must follow when determining whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in [§ 404.1509 for DIB and § 416.909 for SSI], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings ["Listings"] in [20 C.F.R. pt. 404, subpt. P, app. 1] . . . and meets the duration requirement, we will find that you are disabled. . . .
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity ["RFC"] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .
>
> (v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . . .

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The burden of proof and production rests with the claimant during the first four steps of the analysis. *Pass*, 65 F.3d at 1203. The burden shifts to the Commissioner at the fifth step to show that alternative work is available for the claimant in the national economy. *Id.*

In the case of multiple impairments, the Regulations require that the ALJ "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. §§ 404.1523, 416.923. If a medically severe combination of impairments is found, the combined impact of those impairments will be considered throughout the disability determination process. *Id.* §§ 404.1523, 416.923.

### C.     Findings of the ALJ

Plaintiff was 51 years old on the alleged onset date of disability and 53 years old on the date of the hearing. Tr. 22 ¶ 7. The ALJ found that he has a limited education (plaintiff having testified that he did not complete high school (Tr. 35)) and that he had past relevant work as a truck driver and log dump truck driver. Tr. 22 ¶¶ 6, 8.

Applying the five-step analysis of 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since his alleged onset of disability. Tr. 15 ¶ 2. At step two, the ALJ found that plaintiff had the following medically determinable impairments that were severe within the meaning of the Regulations: degenerative disc disease of the lumbar spine with radiculopathy status post laminectomy, light femur fracture, asthma, hypertension, hyperlipidemia, avascular necrosis of the right hip, and borderline obesity. Tr. 15 ¶ 3. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that meets or equals one of the Listings. Tr. 16 ¶ 4.

The ALJ next determined that plaintiff had the RFC to perform a limited range of light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), which provide:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting
> or carrying of objects weighing up to 10 pounds. Even though the weight lifted

may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).[3]

The ALJ included the following limitations in the RFC:

a sit/stand option every 30 minutes; can perform occasional postural activities; can frequently, reach, handle, and finger with the right upper extremity; limited to work that only involves occasional reading, not complex; no more than very simple math; avoid concentrated exposure to hazards and pulmonary irritants; limited to simple repetitive tasks, unskilled work; occasional interpersonal contact; and routine and no high output or quota work.

Tr. 18 ¶ 5.

At step four, the ALJ found that plaintiff was unable to perform his past relevant work. Tr. 22 ¶ 6. At step five, the ALJ accepted the testimony of the vocational expert and found that there were jobs in the national economy existing in significant numbers that plaintiff could perform, including jobs in the occupations of hand bander, cardboard inserter, and laundry checker. Tr. 23 ¶ 10. The ALJ accordingly concluded that plaintiff was not disabled. Tr. 23 ¶ 11.

D.      Standard of Review

Under 42 U.S.C. §§ 405(g) and 1383(c)(3), judicial review of the final decision of the Commissioner is limited to considering whether the Commissioner's decision is supported by substantial evidence in the record and whether the appropriate legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456

---

[3] *See also Dictionary of Occupational Titles* ("DOT"), app. C § IV, def. of "L–Light Work" (U.S. Dep't of Labor 4th ed. rev. 1991), http:// www.oalj.dol.gov/libdot.htm (last visited 20 Jan. 2015). "Light work" and the other terms for exertional level as used in the Regulations have the same meaning as in the DOT. *See* 20 C.F.R. §§ 404.1567, 416.967.

(4th Cir. 1990). Unless the court finds that the Commissioner's decision is not supported by substantial evidence or that the wrong legal standard was applied, the Commissioner's decision must be upheld. *See Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is more than a scintilla of evidence, but somewhat less than a preponderance. *Perales*, 402 U.S. at 401.

The court may not substitute its judgment for that of the Commissioner as long as the decision is supported by substantial evidence. *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). In addition, the court may not make findings of fact, revisit inconsistent evidence, or make determinations of credibility. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979). A Commissioner's decision based on substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion. *Blalock*, 483 F.2d at 775.

Before a court can determine whether a decision is supported by substantial evidence, it must ascertain whether the Commissioner has considered all relevant evidence and sufficiently explained the weight given to probative evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). "Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

## II.    OVERVIEW OF PLAINTIFF'S CONTENTIONS

Plaintiff argues that the case should be remanded for the award of benefits or, alternatively, for a new hearing on the grounds that the ALJ erred in: (1) evaluating the medical

opinions of plaintiff's primary care physician Toby B. Okons, M.D. and consulting psychologist R. Meredith Hall, Ph.D.; (2) assessing plaintiff's credibility; and (3) not discussing certain testimony of the vocational expert. Each ground is examined in turn below.

## III.   DISCUSSION

### A.   ALJ's Assessment of Medical Opinion Evidence

#### 1.   Applicable Law

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). An ALJ must consider all medical opinions in a case in determining whether a claimant is disabled. *See id.* §§ 404.1527(c), 416.927(c); *Nicholson v. Comm'r of Soc. Sec. Admin.*, 600 F. Supp. 2d 740, 752 (N.D.W. Va. 2009) ("Pursuant to 20 C.F.R. §§ 404.1527(b), 416.927(b), an ALJ must consider all medical opinions when determining the disability status of a claimant.").

The Regulations provide that opinions of treating physicians and psychologists on the nature and severity of impairments are to be accorded controlling weight if they are well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Craig*, 76 F.3d at 590; *Ward v. Chater*, 924 F. Supp. 53, 55-56 (W.D. Va. 1996); Soc. Sec. R. 96-2p, 1996 WL 374188 (2 July 1996). Otherwise, the opinions are to be given significantly less weight. *Craig*, 76 F.3d at 590. In this circumstance, the Regulations prescribe factors to be considered in determining the weight to be ascribed, including the length

and nature of the treating relationship, the supportability of the opinions, and their consistency with the record. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

The ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. R. 96-2p, 1996 WL 374188, at *5; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Ashmore v. Colvin*, No. 0:11-2865-TMC, 2013 WL 837643, at *2 (D.S.C. 6 Mar. 2013) ("In doing so [i.e., giving less weight to the testimony of a treating physician], the ALJ must explain what weight is given to a treating physician's opinion and give specific reasons for his decision to discount the opinion.").

The same factors used to determine the weight to be accorded the opinions of physicians and psychologists (and other "acceptable medical sources") apply to the opinions of providers who are deemed to be at a different professional level (or so-called "other sources"). *See* Soc. Sec. R. 06-03p, 2006 WL 2329939, at *2, 4 (9 Aug. 2006); *see also* 20 C.F.R. §§ 404.1527(c) (evaluation of medical opinions); 416.927(c) (same); 404.1513(d) (partial listing of "other sources"); 416.913(d)(1) (same). As with opinions from physicians and psychologists, the ALJ must explain the weight given opinions of other sources and the reasons for the weight given. *See* Soc. Sec. R. 06-03p, 2006 WL 2329939, at *6 ("[The ALJ] generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."); *Napier v. Astrue*, No. TJS-12-1096, 2013 WL 1856469, at *2 (D. Md. 1 May 2013) ("[T]he ALJ is required to 'explain in the decision the weight given to . . . any opinions from

treating sources, non-treating sources, and other non-examination sources who do not work for the [the Social Security Administration].").

The opinions of physicians and psychologists, and other sources on issues reserved to the Commissioner, that is, legal conclusions, are not entitled to special weight because of their source, including statements that the claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(d)(1), (3); 416.927(d)(1), (3). But these opinions must still be evaluated and accorded appropriate weight. *See* Soc. Sec. R. 96-5p, 1996 WL 374183, at *3 (2 July 1996).

### 2. Medical Opinion of Dr. Okons

Dr. Okons' medical opinion regarding plaintiff is set forth in a letter addressed "To Whom It May Concern," dated 3 March 2011. Dr. Okons states that he has been treating plaintiff since November 2005 and that he is on multiple medications for 12 listed conditions.[4] Tr. 501. Dr. Okons then offers his assessment of plaintiff:

> He has chronic pain in the Bilateral Knee, Bilateral Lower Extremity and in the Lower Back areas with Bilateral Lower Extremity Radiculopathy. Mr. Rogers is experiencing recurring chronic pain in the lower back area, he [has] history of TA-LS Right Hemilaminectomy in the past. The patient is experiencing difficulty ambulating due to discomforts radiating to the bilateral lower leg areas. Patient also has a history of nagging lower back pain radiating to bilateral lower extremities. Patient's condition is gradually getting worse with widespread aching and stiffness accompanied by extreme fatigue, depression, stress, anxiety and sleep deprivation secondary to Depression and Chronic pain. His medical conditions require[] multiple medications.
>
> *In my opinion, Mr. Rogers will have difficulty carrying out normal daily living activities due to his chronic condition.*

Tr. 501 (emphasis added).

In his decision, the ALJ gave limited weight to Dr. Okons' opinion, stating:

---

[4] The conditions are: hypertension, chronic bilateral knee pain, chronic lower back pain, chronic bilateral sciatica with bilateral lower extremity radiculopathy, bilateral lower extremity pain, bilateral knee pain, degenerative joint disease/osteoarthritis, depression, anxiety, hypercholesterolemia, reflux disease, and insomnia. Tr. 501.

The undersigned gives limited weight to the opinion of Dr. Toby Okons regarding the claimant's difficulty carrying out daily activities due to chronic pain, as it is inconsistent with the claimant's self-reported ability of driving his pickup for up to three hours despite "nagging" back pain (14F/12, 15F/10). Further, his opinion was rendered over one year prior to treatment records indicating that the claimant's off-loader brace was "significantly improving his symptoms" subsequent to injections administered by Dr. Okons in June 2012 (27F/5).

Tr. 21-22 ¶ 5.

Plaintiff argues, first, that the ALJ erred by purportedly rejecting Dr. Okons' opinion that plaintiff has difficulty ambulating and doing so on the grounds that plaintiff has the ability to perform a sedentary activity, driving. As can readily be seen, though, plaintiff's argument mischaracterizes the ALJ's determination. The ALJ nowhere states that he was addressing specifically the finding that plaintiff had difficulty ambulating. Rather, the ALJ's determination related to Dr. Okons' broader opinion regarding plaintiff's ability to "carry[] out normal daily living activities due to his chronic condition." Tr. 501. Dr. Okons included plaintiff's difficulty ambulating as one of among several chronic conditions plaintiff has. Tr. 501. Since plaintiff's chronic condition included back pain, it was not irrational for the ALJ to rely on the sedentary activity of driving as a basis for his determination.

Plaintiff's argument also mischaracterizes the ALJ's determination by asserting that the ALJ rejected Dr. Okons' opinion. He did not. Rather, he gave it limited weight.

The ALJ's attribution of some weight to Dr. Okons' opinion is evidenced by his inclusion of a sit/stand option in his RFC determination. This option helps address plaintiff's difficulty in performing normal daily living activities to the extent it is based on his back pain as well as his problems with ambulation since ambulation involves standing. Indeed, in discussing Dr. Okons' opinion, plaintiff argues that his inability to do a "significant amount of standing and walking is what renders him disabled under the grids." (Pl.'s Mem. 12).

Plaintiff also challenges the ALJ's finding that Dr. Okons rendered his opinion "over one year prior to treatment records indicating that [plaintiff's] off-loader brace was 'significantly improving his symptoms' subsequent to injections administered by Dr. Okons in June 2012 (27F/5 [Tr. 688])." Tr. 21-22¶ 5. Plaintiff's argument again flounders at the outset because he mischaracterizes what the ALJ said. He argues that the ALJ attributed plaintiff's improvement in 2012 to injections. In fact, though, as can be seen, the ALJ quoted a record attributing the improvement to a brace.

This record is the note on plaintiff's 6 June 2012 office visit to orthopedist Jason B. Lowe, M.D. The ALJ correctly represented this note. It states that, at that visit, plaintiff reported that "the off-loader brace [on his left knee] is significantly improving his symptoms." Tr. 688. The note also indicates that plaintiff received the first in a series of three injections of viscosupplementation[5] into his left knee, which he tolerated well.[6] Tr. 688.

Plaintiff argues that the ALJ's reliance on the 6 June 2012 visit was erroneous because the following week plaintiff's "injection had worn off and his symptoms had returned." (Tr. 685). (Pl.'s Mem. 13). Plaintiff alludes to the note on his 13 June 2012 visit with Dr. Lowe. (Tr. 685-86). Plaintiff mischaracterizes the note. As to plaintiff's left knee, the note does not address injections, but only the brace. The note affirms that the brace "worked very well for [plaintiff]." Tr. 685. Thus, rather than undermining the ALJ's determination, the note supports it.

---

[5] "In this procedure, a gel-like fluid called hyaluronic acid is injected into the knee joint. Hyaluronic acid is a naturally occurring substance found in the synovial (joint) fluid. It acts as a lubricant to enable bones to move smoothly over each other and as a shock absorber for joint loads." American Academy of Orthopaedic Surgeons, OrthoInfo, "Viscosupplementation Treatment for Arthritis," http://orthoinfo.aaos.org/topic.cfm?topic=a00217 (last visited 20 Jan. 2015).

[6] Plaintiff acknowledges this note, stating, however, that it found plaintiff to have obtained significant relief "from his injection and brace." (Pl.'s Mem. 13). While, as indicated, the note does state the brace had improved his symptoms, there is no statement to that effect for the injection, only that plaintiff tolerated it well. Tr. 688.

There are statements in the note that steroid injections had worn off and that symptoms were starting to return, but they relate to plaintiff's right knee. Tr. 685. Plaintiff had not yet used an off-loader brace with the right knee, although Dr. Lowe had ordered one for it. Tr. 685. Dr. Lowe also planned to initiate, subject to confirmation of insurance coverage, the same series of viscosupplementation injections for the right knee that he had already begun with the left knee. Tr. 685-86. Significantly, the note indicates that plaintiff "now complains more of his right knee" than his left, which, at that point, was being treated with the off-loader brace and viscosupplementation injections. Even though the right knee was more troublesome to plaintiff, Dr. Lowe diagnosed the arthritis in it "as mild in nature." Tr. 685.

Dr. Okons' opinion was not tantamount to one that plaintiff was unable to work. He did not opine that plaintiff could not carry out normal daily living activities, but rather that he would have "difficulty" doing so. Tr. 501. Thus, even if the ALJ had given the opinion controlling weight it itself would not have established that plaintiff was disabled.

There is considerable evidence supporting the ALJ's attribution of limited weight to Dr. Okons' opinion beyond that already discussed. Such evidence includes the note of plaintiff's visit to Dr. Lowe a week after the 13 June 2012 visit, on 20 June 2012, for another viscosupplementation injection stating that plaintiff's left knee "has started to feel slightly better." Tr. 684. In addition, on 24 January 2011, Dr. Okons stated in response to a memorandum from the North Carolina Division of Vocational Rehabilitation Services ("NCDVRS") inquiring about plaintiff's ability to work that he could return to work at what amounted to light exertional level. Tr. 368. The non-examining state agency consultants found that plaintiff had the RFC to perform medium work with limitations (Tr. 72-76 (Feb. 2011); 110-15 (Apr. 2011)). The ALJ explained that he afforded these consultant opinions

significant weight to the extent that they determine that the claimant is able to work despite his limitations with reading and math. However, the undersigned determined a more limiting [RFC] based on the record as a whole and giving the claimant the benefit of any doubt.

Tr. 21 ¶ 5. Plaintiff does not challenge this determination by the ALJ.

The court concludes that the ALJ's assessment of Dr. Okons' opinion is supported by substantial evidence and based on proper legal standards. The court accordingly rejects plaintiff's challenge to it.

### 3. Medical Opinions of Dr. Hall

On 12 November 2010, consulting psychologist R. Meredith Hall, Ph.D., performed a psychological evaluation of plaintiff, including the administration of various tests, to aid in the determination of his eligibility for services through the NCDVRS. (Tr. 361-67).[7] In the section entitled, "FACTORS RELATED TO SEVERITY OF IMPAIRMENT AND SIGNIFICANT FUNCTIONAL LIMITATIONS," Dr. Hall made the following findings:

This man's weakness in reading and arithmetic will promote some significant functional limitations, as he will find it very hard to fill out job application forms and to complete on the job reading. He will also have difficulty in completing elementary arithmetic demands which are likely to be present on most jobs. His sense of isolation and inadequacy will be strong contributors to some adaptive behavior deficits, and these include:
1. Having difficulty concentrating for reasonable periods of time and being easily distracted.
2. Having a problem exhibiting reasonable judgment, decision making, and avoiding impulsive behavior.
3. He will have a problem in seeking and accepting social interaction with others on the job.
4. He will have difficulty in establishing and maintaining interpersonal relationships on the job.
5. He should have a problem in avoiding behaviors that result in adverse consequences.

Tr. 363.

---

[7] Page 366 and 367 are duplicates of pages 364 and 365.

In a section entitled "Summary and Indications for Counselor Use," Dr. Hall stated, among other findings:

> Mr. Rogers has some potential for functioning in a nurturing type occupation where he feels needed and some appreciation. He might be well situated to be a live-in counselor in some half-way house type situation. The client apparently has had a long history of dealing with difficulties in this area, and at his present age may be capable of providing a supportive relationship to younger individuals. In any program in which he participates, the client will need some support such as a job coach. He may need some personal support and will need a chance to receive positive feedback when it is genuinely deserved in his training location. He is a somewhat insecure individual who will certainly benefit from recognition of his efforts.

Tr. 364 ¶ 3.

Another record relating to the NCDVRS, which was previously mentioned, is the memorandum from it to Dr. Okons and his response to it regarding plaintiff's ability to return to work. Tr. 368-69. More specifically, the memorandum (Tr. 368) was from a NCDVRS rehabilitation counselor, it bore the same date as Dr. Hall's evaluation, and had attached to it a release (Tr. 369) signed by plaintiff. The memorandum requests information on "a release to work and a list of work restrictions/necessary workplace accommodations" for plaintiff. Tr. 368. In his handwritten responses to questions set out following this request, Dr. Okons noted that plaintiff "was advised to return to work on 21 January 2011," subject to "no lifting, pushing and pulling [greater than] 20 lbs." Tr. 368.

The other NCDVRS-related document in the record is a letter dated 2 February 2011 addressed to Disability Determination Services[8] stating that plaintiff could not work:

> I am writing to report that Ronald Rogers has recently applied for Vocational Rehabilitation Services. Mr. Rogers is diagnosed with Degenerative Joint Disease,

---

[8] Disability Determination Services is a North Carolina state agency that makes decisions on applications for disability under the Social Security program. *See* N.C. Div. of Vocational Rehab. Servs., http://www.ncdhhs.gov/dvrs/pwd/dds.htm (last visited 20 Jan. 2015).

Chronic Lower Back Pain, Osteoarthritis, Reading Disorder, Arithmetic Disorder, Dysthymic Disorder, Generalized Anxiety Disorder and Personality Disorder with Passive Dependent Features.

Mr. Rogers has significant deficits in the following functional capacity areas: communication, interpersonal skills, self direction and work tolerance. He is unable to tolerate working in his present condition. Based on his need for ongoing psychological and medical evaluation/treatment, VR feels that Mr. Rogers is unable to work at this time and it would prove beneficial for him to pursue disability benefits.

Tr. 504.

Plaintiff argues that the ALJ did not consider Dr. Hall's evaluation. He points to the ALJ's finding regarding the opinions of "the vocational rehabilitation counselors." Tr. 22 ¶ 5. The ALJ stated:

The undersigned gives limited weight to the opinions of the vocational rehabilitation counselors, as they are not considered an acceptable medical source within the regulatory definition in 20 CFR 404.1513 and 416.913 (4F, 5F, 15F). However, the undersigned may and does accord limited weight to their opinions and they have been accommodated in the residual functional capacity, in particular clearance to return to work with a limit to light lifting (SSR-06-3p, Exhibit 5F/I).

Tr. 22 ¶ 5. Plaintiff contends that because Dr. Hall, as a psychologist, is an acceptable medical source, this finding indicates that the ALJ overlooked her evaluation. The court disagrees.

The ALJ expressly discussed Dr. Hall's evaluation earlier in his decision, specifically, in connection with his listing determination at step three. He stated:

[Plaintiff] alleged a history of limited education due to poor reading and math skills but a psychological evaluation reveals a full scale IQ of 86 (4F/1). He was diagnosed with reading and arithmetic disorders yet these diagnoses are met with caution as the examiner did not include a testing validity statement and appeared to rely exclusively on the claimant's self-report of academic limitations. As well, the report notes that he reads on a fifth grade level but he testified that he passed the examination for a commercial driver's license which is completely inconsistent with his test results (4F/2).

Tr. 17 ¶ 4. Plaintiff does not challenge this assessment by the ALJ.

Further, in his finding regarding the opinions of the vocational rehabilitation counselors, the ALJ cites to the exhibit comprised in its entirety of Dr. Hall's evaluation, Exhibit 4F. Tr. 22 ¶ 5. This citation signifies that the ALJ did consider Dr. Hall's evaluation in making this finding and that the finding encompasses Dr. Hall's evaluation.

The ALJ erred, of course, in including Dr. Hall among the vocational counselors, not only because she is not a vocational counselor, but because, as plaintiff points out, her opinions are subject to a different review standard.[9] The ALJ did, though, state that he gave the vocational rehabilitation opinions, ostensibly including Dr. Hall's, limited weight and that they are reflected in his RFC determination. Tr. 22 ¶ 5. In fact, Dr. Hall's opinions are. The RFC restricts plaintiff to work that involves only "occasional reading, not complex; no more than very simple math; avoid concentrated exposure to hazards and pulmonary irritants; limited to simple repetitive tasks, unskilled work; occasional interpersonal contact; and routine and no high output or quota work." Tr. 18 ¶ 5. Plaintiff has not convincingly demonstrated that the ALJ's assessment of Dr. Hall's opinions would have been any different had the ALJ applied the correct standard to his evaluation of all portions of Dr. Hall's evaluation.

Indeed, even if Dr. Hall's opinions were given controlling weight, they themselves would not establish that plaintiff was disabled because Dr. Hall did not find plaintiff's various difficulties to be so severe as to preclude all work activities. For example, as quoted above, she found that plaintiff "has some potential for functioning in a nurturing type of occupation where he feels needed and some appreciation." Tr. 364 ¶ 3. She went on to suggest that plaintiff could himself be an effective counselor. Tr. 364 ¶ 3.

---

[9] As noted, the ALJ included the opinion that plaintiff had clearance to return to light work among those of the vocational rehabilitation counselors, although this was an opinion of Dr. Okons. *See* Tr. 368. The fact that the ALJ thereby did not apply the "acceptable source" standard to it is obviously not prejudicial to plaintiff, and plaintiff asserts no objection regarding the error.

As noted, the ALJ explained his assessment of Dr. Hall's findings regarding plaintiff's reading and math ability. Tr. 17 ¶ 4. The ALJ explained that he attributed limited weight to the vocational rehabilitation opinions generally on the grounds that the counselors are not acceptable medical sources. That ground, of course, does not apply to Dr. Hall. But the ALJ's decision makes clear his assessment of the areas addressed by Dr. Hall beyond plaintiff's math and reading ability.

For example, in determining that plaintiff had moderate difficulties in maintaining social functioning and concentration, persistence, or pace, the ALJ stated:

> [T]he claimant's back impairment and depression . . . limit his ability to perform some daily activities. Yet, the record reflects the claimant's wife reported that he is able to attend church events, use the computer daily, and watch television each day (12E). . . . The undersigned gives the claimant the benefit of the doubt regarding his concentration, persistence, and pace due to pain. However, he is able to use a computer daily and testified that he took and passed the commercial driver's license test on his own which does not suggests marked or extreme limitations in this area.

Tr. 17 ¶ 4. Plaintiff does not challenge these findings.

In making his RFC determination, the ALJ further found as follows:

> Although the claimant alleges disabling physical and mental impairment, the evidence does not demonstrate that his symptoms preclude all basic work activity. The claimant testified that he is unable to maintain employment because of depression and back pain but the record reflects seven mental health appointments for initial evaluation and medical management without therapy or counseling (23F, 24F). While he is diagnosed with major depressive disorder and has been treated for several times for episodes of psychiatric distress, his office visits of 2012 note stable mental status with euthymic mood and no psychotic behaviors, as each follow-up appointment notes "stable" condition (lF, 11F, 12F, 20F, 23F, 24F). . . . The psychological examinations of record indicate depressed mood but Dr. Atul Kantesaria opined that it has a mild effect on his ability to sustain attention to perform simple repetitive tasks, relate to others, and tolerate day to day work stress (12F). The examiner also noted that the claimant would be able to manage funds if awarded benefits. The undersigned gives this opinion significant weight, as it is consistent with the level of treatment that the claimant receives from his treating doctors at Coastal Carolina Neuropsychiatric Consultants (23F, 24F).

17

Tr. 20-21 ¶ 5. Plaintiff also does not challenge these findings by the ALJ.

Thus, any error by the ALJ in not expressly setting out the reasons underlying his attribution of limited weight to the opinions of Dr. Hall is harmless. *See*, *e.g.*, *Garner v. Astrue*, 436 Fed. Appx. 224, 226 n.* (4th Cir. 2011) (applying *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)); *Huffman v. Colvin*, No. 1:10CV537, 2013 WL 4431964, at *4 & n.7, 7 (M.D.N.C. 14 Aug. 2013).

Plaintiff has therefore failed to show that the ALJ committed reversible error with respect to the opinions of Dr. Hall. The court concludes that the ALJ's assessment of Dr. Hall's opinions is supported by substantial evidence and, subject to the harmless errors noted, based on the proper legal standards. It accordingly rejects this challenge to the ALJ's decision.

### B. ALJ's Credibility Determination

An ALJ's assessment of a claimant's credibility involves a two-step process. *Craig v. Chater*, 76 F.3d at 593–96; 20 C.F.R. §§ 404.1529(a)-(c), 416.929(a)-(c); Soc. Sec. Ruling 96–7p, 1996 WL 374186, at *1 n.1; 2 (2 July 1996). First, the ALJ must determine whether the claimant's medically documented impairments could cause his alleged symptoms. Soc. Sec. Ruling 96–7p, 1996 WL 374186, at *2. Next, the ALJ must evaluate the extent to which the claimant's statements concerning the intensity, persistence, or functionally limiting effects of the symptoms are consistent with the objective medical evidence and the other evidence of record. *See id.*; *see also* 20 C.F.R. §§ 404.1529(c)(3) (setting out factors in addition to objective medical evidence in evaluation of a claimant's pain and other symptoms), 416.929(c)(3) (same). If the ALJ does not find plaintiff's statements to be credible, the ALJ must cite "specific reasons" for that finding that are "supported by the evidence." Soc. Sec. Ruling 96–7p, 1996 WL 374186, at *2, 4; *Jonson v. Colvin*, No. 12cvl742, 2013 WL 1314781, at *7 (W.D. Pa. 28 Mar. 2013) ("If an

ALJ concludes the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in his or her decision."); *Dean v. Barnhart*, 421 F. Supp. 2d 898, 906 (D.S.C. 2006).

In assessing plaintiff's allegations, the ALJ made the step-one finding that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." Tr. 19 ¶ 5. At the second step of the credibility assessment, the ALJ found that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . [RFC] assessment." Tr. 19 ¶ 5.

The ALJ explained his ruling as follows:

> With regard to the claimant's back pain, radiologic imaging reveals slight medial joint space narrowing of the right knee, osteoarthritis of the left knee, and degenerative changes of the lumbar spine with moderate narrowing at L3/4 and L4/5 (3F, 27F). However, there is no evidence of disc herniation, severe spinal canal stenosis, or acute abnormality at any level (3F). The record is replete with complaints and treatment for back pain with several medications (2F, 3F, 19F, 22F, 27F, 28F). However, the claimant testified that he has little to no side effects. He testified that he does not get much relief from his medications and treatment but the record documents that his brace and injections are "significantly improving his symptoms" (27F). He complains to his treating doctor that his knee and back pain is increasing but the doctor notes, "patient is stable" and he uses a TENs unit and hot/cold packs (22F). *On June 20, 2012 the claimant received an injection and reported that his left knee was feeling slightly better and an MRI revealed no changes of the right knee (27F/1)*. The claimant testified that he is unable to perform most daily activities and he sits in a recliner most of the day. Conversely, he also testified that he is able to drive his pickup truck for three hours, which contradicts his testimony that he must recline to alleviate back strain. The record reflects a third party function report indicating difficulty getting in and out of the tub, getting up and down from the toilet, and poor hygiene due to depression and pain (12E). Yet, there is no evidence to support this level of physical impairment. *The record reflects that all of the claimant's most recent treatment has been for the abscesses on his hand, not chronic back pain, and no neurological or musculoskeletal abnormalities are noted (25F, 26F)*. He was even advised to begin exercising to alleviate radicular pain and increase range of motion (28F/4). Moreover, neurology studies show only mildly abnormal findings due to chronic radiculopathy without active finding of

denervation. Overall, the record does not demonstrate that the claimant's back and knee impairments are disabling and preclude all work activity inconsistent with the [RFC determination].

. . . .

The undersigned has considered the allegations in the light most favorable to the claimant, however his claim of disability is not supported by the record. At the hearing, the claimant testified to limitation in standing, sitting, walking, and lifting for long periods and disabling depression. He also testified that he must recline for most of the day to relieve back pain. *However, the record does not support his testimony as his most recent physical examination does not indicate disabling limitations of the extremities and the claimant is even encouraged to exercise which is not suggestive of disabling back and knee pain (27F, 28F).* The undersigned has considered but granted little probative weight to his testimony in this regard. Thus, the undersigned does not find the claimant's allegations of disabling symptoms and functional limitations entirely credible. Although the undersigned finds that his symptoms of pain and depression may limit his functional capacity to some degree, his allegations are not credible to the extent that his capacity is so limited that he is unable to engage in substantial gainful activity consistent with the [RFC] assessed . . . . The claimant's own estimates were not inconsistent with light exertion, and as more fully described above medical examinations and treatment notes do not support greater limitation (SSR 96-7p ).

Tr. 19-20 ¶ 5; 21 ¶ 5 (emphasis added).

Plaintiff argues that the ALJ erred in finding that "all of the claimant's most recent treatment has been for the abscesses on his hand, not chronic back pain, and no neurological or musculoskeletal abnormalities are noted (25F, 26F)." Tr. 20 ¶ 5. The records the ALJ cites are from April and May 2012. (Tr. 671-83). Plaintiff is correct that this finding does not account for the records of plaintiff's visits with Dr. Lowe in June 2012. As the prior discussion indicates, however, the ALJ did discuss some of these records in his assessment of Dr. Okons' opinion. Tr. 21-22 ¶ 5. He also discussed Dr. Lowe's records as part of his review of the medical records in the case. Tr. 19-20 ¶ 5. The ALJ stated:

He testified that he does not get much relief from his medications and treatment but the record documents that his brace and injections are "significantly improving his symptoms" (27F). . . . On June 20, 2012 the claimant received an injection and reported that his left knee was feeling slightly better and an MRI revealed no changes of the right knee (27F/1).

Tr. 19-20 ¶ 5.  Thus, there is no question that the ALJ considered the records which actually were most recent.

Even though the visits to Dr. Lowe were not for abscesses on his hands, they also were not for chronic back pain.  Nor did they entail treatment for neurological abnormalities.  Therefore, portions of the ALJ's characterization of the records from April and May 2012 also apply to Dr. Lowe's records from June 2012.

There is another similarity in the two sets of records—they are from basically the same time period.  Characterization of the April and May 2012 records, rather than those of Dr. Lowe from June 2012, as the most recent is therefore immaterial in this additional sense.

Moreover, the ALJ did later in his explanation recognize Dr. Lowe's records (Ex. 27F), along with record from Dr. Okons' clinic (Ex. 28F), as the most recent.  As set out in the above excerpt from the ALJ's decision, he stated:

> However, the record does not support his testimony as his most recent physical examination does not indicate disabling limitations of the extremities and the claimant is even encouraged to exercise which is not suggestive of disabling back and knee pain (27F, 28F).

Tr. 21 ¶ 5 (citing, *e.g.*, 6 June 2012 note of office visit with Dr. Okons discussing daily exercise at Tr. 694).  For this and the other reasons discussed, the court finds that the ALJ's erroneous description of the records in Exhibits 25F and 26F as the most recent is harmless.  *See*, *e.g.*, *Garner,* 436 Fed. Appx. at 226 n.*; *Huffman*, 2013 WL 4431964, at *4 & n.7.

Plaintiff also argues that the ALJ erred in finding that plaintiff was not credible regarding his knee pain on the basis of an MRI of his right knee showing only mild arthritis.  Plaintiff refers to the ALJ's finding that "[o]n June 20, 2012 the claimant received an injection and reported that his left knee was feeling slightly better and an MRI revealed no changes of the right

knee (27F/1)." Tr. 20 ¶ 5. Plaintiff argues that the ALJ's reliance on this MRI is erroneous because most of plaintiff's knee pain is from the left knee and the ALJ did not mention an x-ray showing plaintiff to have bone-on-bone medial gonarthrosis (*i.e.*, arthritis of the knee joint) in the left knee.

Plaintiff's contentions are meritless. As the foregoing discussion makes clear, the ALJ based his determination on plaintiff's credibility on many more factors than simply the MRI he cites. It was clearly proper for the ALJ to include the MRI among the factors he considered.

As to the x-ray, the ALJ did discuss it. He stated, as quoted above: "With regard to the claimant's back pain, *radiologic imaging* reveals slight medial joint space narrowing of the right knee, osteoarthritis of the left knee, and degenerative changes of the lumbar spine with moderate narrowing at L3/4 and L4/5 (3F, 27F)." Tr. 19 ¶ 5 (emphasis added).

Further, the x-ray was discussed in a two-page letter dated 9 May 2012 from Dr. Lowe to Dr. Okons, which was included in the exhibit containing Dr. Lowe's records, Exhibit 27. The ALJ cited Exhibit 27—which spans merely seven pages—six times in his decision. *See* Tr. 19 ¶ 5; 20 ¶ 5; 21 ¶ 5; 22 ¶ 5. In the letter, Dr. Lowe describes his plan to treat plaintiff's left knee with an off-loader brace and viscosupplementation injections. Tr. 689-90. The ALJ, of course, discussed both treatments in his decision. Tr. 19 ¶ 5; 21-22 ¶ 5. For this and the other reasons stated, plaintiff's contention that the ALJ overlooked the x-ray at issue is utterly baseless.

The court concludes that the ALJ's analysis of plaintiff's credibility is supported by substantial evidence and based on proper legal standards. The court accordingly rejects plaintiff's challenge to it.

### C.     Vocational Expert's Testimony

At the hearing, plaintiff's counsel elicited testimony from the vocational expert based on a hypothetical assuming a person with various limitations Dr. Hall found plaintiff to have. The hypothetical reads:

> [A] person's [vocational rehabilitation] test results came back stating that he would have significant functional limitations such as having difficulty concentrating for reasonable periods of time, being easily distracted, having problems exhibiting reasonable judgment, decision making and avoiding impulsive behavior, also having problems seeking and accepting social interaction with others on the job. If such a person came back with results like that, do you find in your experience that such a person could be placed easily into any other kind of competitive employment?

Tr. 60 (alluding to Dr. Hall's findings at Tr. 363). The vocational expert responded: "No. I find that that type of individual with that particular kind of profile would benefit more from a very structured environment, one in which there would be a job coach or a sheltered workshop situation." Tr. 60.

Plaintiff argues that the ALJ erred by not discussing this testimony in his decision. He cites no legal authority for this contention.

It appears to be based, in part, on plaintiff's interpretation of this testimony as signifying that he is unable to work. But that is plainly not what the vocational expert said. She was not asked whether plaintiff could be placed in competitive employment, but whether he could be "easily" placed in such employment. Tr. 60. It was to that inquiry that the vocational expert responded "No." Tr. 60. This testimony is consistent with Dr. Hall's determination that plaintiff retained the capacity to work notwithstanding the difficulties she found him to have.

The vocational expert went on to testify, of course, that the hypothetical person "would benefit more from a very structured environment, one in which there would be a job coach or a sheltered workshop situation." Tr. 60. Notably, the vocational expert did not say that a job

coach or structured workshop would be necessary, just beneficial. Plaintiff equates this testimony to Dr. Hall's statements relating to a job coach. *See* Tr. 364 ¶ 3. But Dr. Hall was speaking of a job coach during a training program in the section of her evaluation entitled "SUMMARY AND INDICATIONS FOR COUNSELOR USE." She stated: "In any *program in which he participates the client* will need some support such as a job coach. He may need some personal support and will need a chance to receive positive feedback when it is genuinely deserved in his *training location*." Tr. 364 ¶ 3 (emphasis added).

An ALJ is not required to discuss every piece of evidence. *See, e.g., Doyle v. Colvin*, No. 7:12–CV–326–FL, 2014 WL 269027, at *10 (E.D.N.C.), *mem. and recomm. adopted by* 2014 WL 269027, at *1 (23 Jan. 2014). The court finds no error in the ALJ's determination not to discuss the foregoing testimony elicited by plaintiff's counsel. It therefore rejects this final challenge to the ALJ's decision.

## IV.    CONCLUSION

After careful consideration of the ALJ's decision and the record in this case, the court finds that the ALJ's decision is supported by substantial evidence and based on proper legal standards. IT IS THEREFORE RECOMMENDED that the Commissioner's motion (D.E. 31) for judgment on the pleadings be ALLOWED, plaintiff's motion (D.E. 29) for judgment on the pleadings be DENIED, and the final decision of the Commissioner be AFFIRMED.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who shall have until 3 February 2015 to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the

unobjected-to proposed factual findings and legal conclusions accepted by the District Judge. Any response to objections shall be filed within 14 days after service of the objections on the responding party.

This, the 20th day of January 2015.

James E. Gates
United States Magistrate Judge